MARIE PONDER CLARK v. PATRICIA PROFFITT CLARK (FOWLER), AND
CECIL CLARK, GUARDIAN OF GENE WAYNE CLARK, JOHN LLOYD
CLARK, GAMBELL CLARK AND GILA CLARK

No. 64

(Filed 17 April 1978)

**1. Contempt of Court § 8— willful disobedience of child custody order—punishment for contempt "withheld"—appeal from contempt order permissible**

Plaintiff was entitled to appeal an order adjudging her in contempt since findings by the trial court that she had willfully disobeyed the court's child custody orders, if sustained, would convict her of both civil contempt under G.S. 50-13.3 and criminal contempt under G.S. 5-1(4); G.S. 5-2 would permit plaintiff to appeal the adjudication of contempt even though the court had imposed no punishment; and the court's "withholding" of punishment without further limitation would allow the court to impose it in the future, and under these circumstances the order holding her in contempt "affected a substantial right" and was therefore appealable. G.S. 1-271; G.S. 1-277.

**2. Contempt of Court § 8— judge's findings of fact—conclusiveness**

In contempt proceedings the judge's findings of fact are conclusive on appeal when supported by any competent evidence and are reviewable only for the purpose of passing on their sufficiency to warrant the judgment.

**3. Infants § 6.1— failure to comply with custody order—sufficiency of findings**

Evidence was sufficient to support the trial court's finding that plaintiff failed to comply with its child custody order requiring plaintiff to deliver the children in question to the sheriff's office at certain times so that defendant could pick them up, and plaintiff's contention that there was no evidence that she was aware of the existence or terms of the order is without merit, since the evidence tended to show otherwise and since neither receipt of a copy of the order nor knowledge of its exact words was a condition precedent to plaintiff's obligation to comply with it.

**4. Infants § 6.1— failure to comply with custody order—sufficiency of findings**

Evidence was sufficient to support the trial court's finding that plaintiff willfully violated its child custody order providing for the children's visitation with defendant by advising the children in question that they did not have to visit with the defendant, their mother, or with their grandmother.

**5. Infants § 6.2— visitation rights modified—showing of changed circumstances required**

The Court of Appeals erred in its decision of *Clark v. Clark*, 23 N.C. App. 589, which concluded that defendant was not required to show changed conditions in order to secure a modification of her visitation privileges, since an agreement by the parties that the court may change visitation privileges in a custody order without any showing of changed conditions does not relieve the court of its duty to determine whether changed circumstances affecting the welfare of the child justify a modification; however, that error has no

Clark v. Clark

significance on this appeal, since the court, in each order entered after the original judgment, made findings demonstrating one or more significant changes in circumstances affecting the welfare of the children in question and justifying the changes made.

**6. Infants § 6.7— "custody"—inclusion of visitation rights**

The word "custody" as used in G.S. 50-13.7 was intended to encompass visitation rights as well as general custody.

**7. Infants § 6.7— visitation rights awarded—failure to find children's best interests**

The trial court erred in ordering visitations by the children in question with defendant, their mother, without finding that the visits were in the children's best interest.

**8. Infants § 6.4— child custody—consideration of child's wishes**

In determining the custody and visitation rights incident to the award of custody of children ages 15, 13 and 12, it is appropriate and desirable for the judge to ascertain and consider the children's wishes in respect to their custody.

ON plaintiff's petition for discretionary review of the unpublished decision of the Court of Appeals filed 18 May 1977, which vacated in part the order of *Lacey, J.*, entered 4 June 1976 in the District Court of MADISON, docketed and argued at the Fall Term 1977 as Case No. 59.

Proceeding for the custody of minor children brought under G.S. 50-13.1 *et seq.* (1976 Replacement).

Gene Wayne Clark (Gene), born 12 April 1960, John Lloyd Clark (John), born 11 April 1963, Gambell Clark (Gambell), born 5 January 1965, and Gila Clark (Gila), born 6 September 1966, are children of the marriage of Wayne Calvin Clark, now deceased, and defendant-appellee, Patricia Proffitt Clark, now Mrs. David Fowler (defendant). Plaintiff-appellant, Marie Ponder Clark (Mrs. Clark), the children's paternal grandmother, instituted this action on 3 May 1972 against their mother, defendant-appellee, who was then a resident of Alabama. Other named defendants are the children themselves and their testamentary guardian, Cecil Clark.

After an extensive hearing on 11 August 1972, Judge J. Ray Braswell signed the first order in the case, a consent judgment by which Mrs. Clark acquired legal custody of the four children. Pertinent portions of the judge's detailed findings of fact are summarized or quoted below:

On or about 15 August 1967 defendant left her husband, Wayne Clark (Clark) and never lived with him again. Thereafter, by a deed of separation, she relinquished the sole custody of the children to their father. For sometime before, and at all times after February 1968, the four children resided with Mrs. Clark and their father until his death on 29 April 1972. Both before and after her son's death Mrs. Clark cared for the children, attended to their discipline and education, and provided them a happy and secure home. During these years defendant visited the children "only at very infrequent intervals, never corresponded with them, or requested information about them." By her conduct "she did abandon her children" and render herself "unfit to presently have the care and custody of her infant children."

Judge Braswell found Mrs. Clark to be a fit and proper person to have the care and custody of the four children and that the children's best interest required that they be committed to her custody. Whereupon, he awarded their "sole care and custody" to Mrs. Clark. He also found, however, that it was in the best interest of the children that they be allowed to visit with their mother in the Madison County home of her parents, Mr. and Mrs. Bernard Proffitt. After requiring defendant and her parents to post a bond guaranteeing that the children would not be removed from the State and that they would be returned to Mrs. Clark after each visit, the court gave defendant the privilege of visiting her children in the home of her parents on the fourth weekend of each month from 10:00 a.m. on Saturday until 6:00 p.m. on Sunday. In addition the judgment contained the following provision:

"This cause is retained for further orders and particularly for entry of special order further specifying the visiting privileges of the defendant, Patricia Proffitt Clark, which said special order only may be entered without showing of change of condition but any such special order shall be entered only after appropriate notice."

The next judgment in this proceeding was rendered in open court on 4 March 1974. Between 11 August 1972 and 4 March 1974, *inter alia*, the following events had occurred:

In November 1972 David Fowler, with whom defendant had been living in Birmingham, Alabama, obtained a divorce from his former wife and married defendant. Thereafter defendant and

Clark v. Clark

Fowler moved into a three-bedroom apartment in a large apartment complex. Defendant, previously unemployed, became the resident manager of the apartment complex, earning from $350 to $1,200 per month. Fowler's income as a Southern Railroad trainmaster was at least $1,400 monthly.

Sometime prior to 3 October 1973 defendant had moved in the cause that the consent judgment of 11 August 1972 be changed to give her custody of the four children. This motion was heard in open court on 3 October 1973 with all parties and their counsel present and participating. At the conclusion of the evidence the matter was continued so that the parties could agree on a child psychologist to provide expert testimony for the court's consideration. Thereafter, "agreement having failed," Judge Braswell notified counsel he would render judgment in open court on 4 March 1974. At that time plaintiff was permitted to call as witnesses the two boys, Gene and John; and, with the consent of counsel, the judge talked with the two girls, Gambell and Gila, in open court.

In addition to the facts set out in the two preceding paragraphs, "from competent evidence received in open court on October 3, 1973 and March 4, 1974," the court found the facts summarized below (enumeration ours):

1. Defendant, now 32 years of age, and her husband, now 34 years old, have good reputations in the community in which they live. Since 11 August 1972 defendant has traveled from Alabama to Madison County every month that she was allowed to visit her children. She has spent much money on these repeated trips and on long distance telephone calls, "and generally has done all she reasonably could to demonstrate her love for her children and to win their love and affection for her."

2. Mrs. Clark, a 57-year-old widow, lives alone with her four grandchildren. The children have a strong attachment to their grandmother, relatives, friends, and pets. They receive social security benefits of $406 per month with which plaintiff provides for their basic personal needs.

3. Defendant is not welcome in plaintiff's home. Without notice to defendant Mrs. Clark changed her telephone to an unlisted number. Plaintiff testified that she "didn't do anything to

tell [Mrs. Fowler] of the change." Defendant was unable to obtain the unlisted telephone number for about three weeks and was unable to have her weekly telephone visits with the children during the interval.

4. Defendant and her husband are able and both desire to provide for the children in their home in Birmingham. The relations between defendant, her husband, and the four children "are warm and affectionate as demonstrated during the times when the children and their mother and stepfather have been permitted to visit together."

5. The four children have great affection for each other. Gene, the eldest, is mature for his 14 years and appears to exercise a strong influence upon his younger brother and two sisters. Although expressing affection for his mother and stepfather he insists he will refuse to leave the home of his grandmother and the community in which he has been reared.

Upon the foregoing findings the court concluded, *inter alia*:

1. A "substantial change in the circumstances affecting the children" has occurred "since the order of custody award of August 11, 1972."

2. Defendant is a fit and proper mother and her husband is a fit and proper person for a parent.

3. Plaintiff is "a fit and proper person to serve as parent to the children." She tacitly disapproves of defendant and makes "no overt effort" to develop in the children "a wholesome sentiment of love and respect for their mother."

4. A sudden permanent change of custody and community residence and separation from each other at this time could harm the children and their future development. It is in the children's best interest that each of them continue to reside with their grandmother but that they "have frequent visits, contacts, and associations with their natural mother and her husband."

The court specifically continued the visiting privileges allowed defendant in the 1972 judgment and granted her the additional privilege of visiting the children and having them visit her in or out of the State at such other times "as shall be mutually agreed upon between the parties." This additional privilege was

conditioned, however, upon the execution and deposit of a $7,500.00 bond guaranteeing the return of the children in accordance with the parties' agreement or the order of the court. The judgment further decreed that any conduct on the part of either plaintiff or defendant which tended to interfere with the development or existence of a natural bond of affection among the children themselves, or between the children and their mother or Mrs. Clark, would constitute grounds for modification of the order.

Judge Braswell signed the foregoing order on 10 April 1974. Plaintiff appealed to the Court of Appeals, which affirmed the order on 20 November 1974. *Clark v. Clark*, 23 N.C. App. 589, 209 S.E. 2d 545.

On 17 April 1975 the parties were again before Judge Braswell upon defendant's motion for custody of her children. Upon the evidence adduced he found the following facts (enumeration ours):

1. Since 10 April 1974 defendant and her husband terminated their employment in Alabama, where defendant was earning $12,000 per year and Mr. Fowler $19,000 per year, and moved to Weaverville, North Carolina. This move was made so that defendant would live closer to her children and have a better opportunity for enlarged visitation privileges. Defendant is now unemployed and Mr. Fowler is employed by Southern Railway at an annual salary of $16,000.

2. Defendant and her husband have purchased a newly constructed residence located in Buncombe County about 30 minutes from Mrs. Clark's residence in Madison County. Defendant's home has four bedrooms, two baths, and furnishings adequate to meet the needs of the children.

3. On various occasions since 10 April 1974 Mrs. Clark has demonstrated her hostility and antagonism toward defendant. She has interfered with communication between the mother and her children at various public and school functions and has refused to permit the children to visit defendant in the manner and to the extent contemplated by the order of 10 April 1974. She has allowed Gene, who is now only 15 years old, to determine when and for how long he and the three younger children shall visit with

their mother. Gene, while of sufficient maturity to choose for himself between his mother and his grandmother, "is not sufficiently mature to make these important decisions on behalf of his younger brother and sisters."

4. Both the grandmother and the mother are fit and proper persons to have the custody, supervision and control of the children. The court's intent that the children be permitted frequent visits, contacts and associations with their natural mother and her husband, expressed in the order of 19 April 1974, has not been carried out; and it is not in the children's best interest that they be exposed to frequent doubt and uncertainty as to whether and when they shall be permitted to visit their natural mother.

Upon the foregoing findings Judge Braswell concluded that circumstances had changed substantially since the entry of the order of 10 April 1974; that it was in the children's best interest that their primary custody remain with Mrs. Clark but that their best interest also required them to have frequent contacts, visits and associations with their mother. He therefore ordered (1) that Gene be permitted to decide when and under what circumstances he would visit his mother; (2) that one week after the ending of the school year the custody of John, Gambell, and Gila be placed in defendant until one week before the beginning of school, this arrangement to continue until each child shall arrive at the age of eighteen; (3) that during the school year custody of John, Gambell, and Gila shall remain with plaintiff, but during this time the three children shall visit with defendant in her home from 6:00 p.m. on Friday until 6:00 p.m. on Sunday on each second and fourth weekend of every calendar month, beginning on 25 April 1975. Provision was also made for the children to visit with defendant at specified periods during the Thanksgiving and Christmas holidays.

The judgment further specified that the custody provisions set out above encompassed social, athletic, and all other events and that the custody provisions were made "absolute in the party designated." Each was enjoined at all times from interfering with the custody of the other. This order was rendered in open court on 17 April 1975, signed on 8 May 1975, and filed as of 12 May 1975.

Clark v. Clark

On 10 June 1975 Judge Braswell cited plaintiff to show cause why she should not be adjudged in contempt of court. This citation was based on two affidavits by defendant which alleged that plaintiff had made it impossible for defendant to obtain the children on 25 April 1975 and on 6 June 1975 as provided in the order of 17 April 1975; that plaintiff had told John he could defy the court order and had advised the children on one occasion to go with defendant but to run away from her the next day, and that plaintiff had informed defendant that she would not enforce the court's order.

In answers filed 3 July and 5 August 1975 respectively, plaintiff denied the averments of defendant's affidavits and alleged that on two occasions after she had packed the children's clothes for their visit with defendant they ran away when they saw defendant approaching and secluded themselves until late at night, to plaintiff's great distress; that the drastic change of custody made in the order of May 1975 separated the three younger children from their brother Gene, their friends, recreational and church activities, and the environment in which they had lived for eight years; that their unhappiness caused them to run away from a swimming pool in Buncombe County where their mother had left them in order to return to plaintiff's home in Madison County by thumbing rides on the highway; and that the change of custody created turmoil which has interfered with their emotional well-being. Plaintiff asked that the question of custody be reopened and that the "children be returned absolutely and unconditionally to plaintiff."

Defendant's two motions that plaintiff be adjudged in contempt and defendant's motion to amend the custody orders of 17 April 1975 came before Judge Robert E. Lacey on 5 August 1975. After hearing the evidence Judge Lacey made the following pertinent findings of fact:

1. On 26 April 1975 Mrs. Clark prepared John, Gambell, and Gila for their weekend visit with defendant and told them their mother would pick them up, then left them playing in the yard of her home under the supervision of "a baby sitter"; that when the children saw their mother approaching they ran "over a bank" and secreted themselves "until the late hours of the evening" to

avoid going with her; that Mrs. Clark was not at home and did nothing to prevent the children from visiting with their mother.

2. On 9 May 1975 the three children visited defendant in accordance with the court order.

3. On 23 May 1975 plaintiff kept Gila with her upon the doctor's orders but turned Gambell and John over to defendant. However, on the following day at a ball game in Marshall these two children ran away from their mother and returned to plaintiff's home. On 14 June 1975 plaintiff delivered John, Gambell, and Gila to the Madison County Sheriff's Department for defendant to pick them up, but the children again ran away and were not found until late in the evening. On 16 June defendant and her husband forcibly removed Gambell and Gila from the Bible School which they were attending in Marshall and kept them at her home in Buncombe County until 31 July 1975. On that date defendant left Gambell and Gila at the Moose Lodge Swimming Pool near Asheville for the afternoon. When she departed the two girls left the pool premises and hitchhiked to plaintiff's home in Madison County.

4. After the order of 17 April 1975 was entered plaintiff read it to John, Gambell, and Gila and informed them that "by order of the court," they had to obey it. At no time did she ever tell the children they could disobey the order of the court, but she did not "ever order the children from their home."

5. Dr. John Patton, a licensed psychiatrist who had examined the three younger children for over a year, opined that it was not in their best interest to be forced to visit their mother against their wishes or to be separated from Gene, their older brother; that the separation of the children from their grandmother and brother during the period between 16 June 1975 and 31 July 1975 had been detrimental to their emotional stability; and that each child is mature enough to express an opinion as to where he should live and "said opinion should be considered by the court."

6. Each child testified that he desired to live with his grandmother rather than with defendant.

7. Defendant, her husband, and three other witnesses testified that a warm and friendly relationship existed between defendant and the children from and after 17 April 1975.

Upon the foregoing findings Judge Lacey concluded: (1) The maturity and emotional stability of John, Gambell, and Gila make their wishes with reference to their custody relevant to decision. Through their actions and statements they have indicated a strong desire to live with Mrs. Clark and there is no suggestion that, if forced to visit with defendant against their will, they would remain with her. (2) At no time following the order of 17 April 1975 has Mrs. Clark defied or refused to obey the order. (3) The circumstances have changed since the entry of the order of 17 April 1975, and it is no longer in the best interest of the children that they be forced to remain with defendant against their will. The welfare of the children will best be served by placing them in the sole care, custody and control of the plaintiff and by allowing—not compelling—them to visit with defendant.

In an order signed 13 August 1975 Judge Lacey, upon the foregoing findings and conclusions, exonerated Mrs. Clark from contempt and dismissed the citations issued to her on 10 June and 9 July 1975. "Until the further orders of this court . . . ," he decreed, "Mrs. Clark shall have the full care, custody and control" of the three children and that "they shall be allowed but not compelled to visit with their mother . . . at such time or times as they may specify or desire." He then continued "this matter" until 18 September 1975 "at which time the said case will be heard by the court on its merits."

The adjourned hearing was not held until 20 November 1975. On that day, after "having heard the evidence," Judge Lacey found that none of defendant's four children had visited with her since 13 August 1975. He entered an order which continued the care, custody and control of the children in the plaintiff and, in addition, "modified the orders heretofore entered" by directing (1) that hereafter Gila and Gambell shall visit with their mother on the fourth weekend each month from 8:00 a.m. on Saturday until 6:00 p.m. on Sunday, but in November 1975 "said visitation privilege shall be on the fifth weekend"; (2) that the two children shall visit with the maternal grandmother, Mrs. Proffitt, at her residence on the second Sunday of each month from 2:00 p.m. until 6:00 p.m. and with their mother at her residence from 4:00 p.m. on December 25, 1975 until 6:00 p.m. on December 31, 1975; (3) that on the occasion of every visitation above plaintiff shall deliver the two girls to the Madison County Sheriff's Department

in sufficient time for defendant or Mrs. Proffitt to pick them up; and (4) that the two boys be permitted to visit with their mother at such times as they determine.

On 5 February 1976 defendant filed a verified affidavit and motion in which she averred that since 24 November 1975 neither she nor Mrs. Proffitt had been able to visit with the children because of plaintiff's refusal to obey the order of that date; and that it was "no longer in the best interst and welfare of the children" to be in the custody of plaintiff, "who is counseling the children in disobedience of the lawful constituted authority of this State." Upon these allegations defendant moved that plaintiff be cited for contempt and that the custody of the children be placed in defendant or a third party.

On 29 January 1976, in accordance with defendant's motion, Judge Lacey cited plaintiff to appear before him on 4 March 1976 "or as soon thereafter as the court will hear the motion and show cause . . . why she should not be adjudged in contempt of court . . . and for further hearing as to whether or not the custody of said children should be changed as set forth in the Motion."

For undisclosed reasons the cause was not heard on 4 March 1976. On 5 April 1976 defendant filed a second motion for an order giving her custody of the children. She averred that plaintiff has continuously refused to permit the children to visit defendant and has counseled them to disobey the court's order; that plaintiff is now physically ill and unable to care and provide for the children; and that they have been required to do all the cooking and other housework, including tasks they are not old enough to perform, and they have been injured while performing such tasks without supervision.

Judge Lacey heard the citation of 20 January 1976 and defendant's motion of 5 April 1976 on 4 June 1976. At that time both plaintiff and defendant offered evidence.

As a witness for the defendant, plaintiff's physician testified that for ten years plaintiff has been a chronic diabetic, requiring constant medication and medical supervision; that she is overweight, has had high blood pressure for many years, and "is on and off" high blood pressure medicine; that she suffers from coronary artery insufficiency, is subject to anginal attacks, and is

Clark v. Clark

"on nitroglycerine." At the time of the hearing she had recently been hospitalized for elevated blood sugar and a bladder infection. She has been advised to take "no strenuous exercise" but "to live a normal life." The doctor would make no prognosis about her continuing coronary insufficiency.

In addition to the physician's testimony defendant's evidence tends to show:

Defendant went to the office of E. Y. Ponder, Sheriff of Madison County, and brother of Mrs. Clark, sometime before 8:00 p.m. on 29 November 1975, the fifth Saturday in November, for the purpose of picking up the children as directed by Judge Lacey on 20 November 1975. The children were not there. When approached, the sheriff told defendant he would not believe she was supposed to have the children until she showed him a court order. He told her that if she "wanted to go home and get the court order" and then find him in Mars Hill (where he was going to investigate a robbery) he would look at it and see whether she had anything to stand on. Defendant did not see her children that weekend.

On the second Sunday in December defendant went to the home of her mother, Mrs. Proffitt, expecting to see the children as directed in the order of 24 November 1975, but they were not there. The night before defendant had talked to Gila, Gambell and John on the telephone and they had told her "that they didn't know whether they were coming to [Mrs. Proffitt's] or not; that they thought that they had other plans but that they might come." Mrs. Proffitt went to the jail for them on that Sunday but they were not there. The sheriff called Mrs. Clark's home but she was not there.

On Christmas Day Mrs. Proffitt called Mrs. Clark's residence and talked with Gene, who told her he and the others were not coming to her house for the scheduled Christmas visit. "Gene acts as spokesman for the children; [Mrs. Clark] has been using him as spokesman all along." In consequence defendant did not go to the jail to pick them up. On the Saturday morning after Christmas defendant waited outside the jail about an hour for the children but they did not come.

Before the children's scheduled visit in January defendant had a telephone conversation with her son Gene. He told her "that they absolutely" could not come to her house again until after they had another hearing. Because of that conversation defendant did not go to the jail for the children again. In January Mrs. Clark told Mrs. Proffitt in a telephone conversation that she did not mind the children visiting with her and Mr. Proffitt but they were not to go to defendant's home in Weaverville.

On February 15, 1976, Mrs. Clark delivered the children to Mrs. Proffitt and from 1:00 p.m. until about 5:45 defendant visited with the children at her mother's home. At that time the children received their Christmas presents and demonstrated affection for defendant and pleasure at being with her. The only other occasions on which defendant saw the children between 20 November 1975 and the June 1976 hearing were at two wrestling matches in which Gene and John participated and when defendant went to the school to check on Gila and Gambell after hearing that Mrs. Clark was in the hospital. During Mrs. Clark's absence, she discovered Gila's hand had been injured in the rollers of a wringer-type washing machine and Gambell's hand had been burned when her blouse caught fire from the stove while cooking supper.

When asked by plaintiff's counsel on cross-examination whether she had "any evidence" that if the two girls were returned to her "they would not run away again," defendant replied that she loved the children and they loved her and she didn't "really believe they really ran away"; that during the summer of 1975 "there was somebody constantly calling them, continuously wanting to be with them," trying to keep them upset and dissatisfied; that Mrs. Clark never called but Gene did. It was, "We love you—we miss you." Gambell's softball team would call to say, "We need you to play softball."

Defendant also stated that on March 10, 1976 she moved from Weaverville to Knoxville, Tennessee, where she and her husband were living in a two-story, five-room house.

The plaintiff elected not to testify. She called as witnesses defendant Cecil Clark, the children's testamentary guardian (a resident of Hickory, North Carolina); Sheriff E. Y. Ponder and his

Clark v. Clark

deputy, the jailer, Clayton Grindstaff; Gene Clark; Gila Clark; and Gambell Clark.

Cecil Clark testified that on Christmas Day and on the fourth weekend in December 1975, January and March 1976 he took the children to the Madison County jail at the times ordered by the court, except for the fourth weekend in February when their uncle died, and that they went voluntarily; that no one ever appeared to pick up the children and he always took them back home. On cross-examination he admitted that at no time on these occasions or thereafter did he ever contact defendant or Mrs. Proffitt; that he had been at the November hearing and was familiar with the November 1975 court order; and that he had told the children if they didn't want to visit defendant he wouldn't make them — that the decision was theirs.

Sheriff Ponder testified that the children were brought to the jail on Christmas Day and on various weekends through March but nobody ever came to pick them up. He recalled the fifth weekend in November 1975 when defendant came to the jail for the children and they were not there. He said he called his sister, Mrs. Clark; that she told him she had not seen the court's order and "she did not know exactly what she was supposed to do"; and that he then told defendant if she would go home and get her copy of the order he would carry it out but without it he could do nothing.

The jailer, Deputy Sheriff Grindstaff, testified that the children had come to the sheriff's office regularly on the second Sunday afternoon and on the fourth Saturday of each month and had waited there "until after the time they were supposed to be picked up." He said, "I never had no reason to call Pat Fowler; that's not part of my job."

Gene, the oldest of the four children, had become 16 and acquired a driver's license by the time of the June 1976 hearing. He testified of his own knowledge that Gambell and Gila had been taken to the Madison County jail every second and fourth weekend since the November 1975 hearing. On two occasions he himself had "brought them into the jailhouse and sat there until about 8:30" before going back home.

Clark v. Clark

On cross-examination Gene said he was at the November 1975 hearing when the girls' visitation schedule with their mother was announced, and that "he supposed" he was the one who had whispered to his grandmother that they had plans for the fourth weekend in November and had thus caused the fifth weekend to be substituted as the visiting period for that month. Conceding that he had had conversations with Mrs. Proffitt about visiting and bringing the girls to see her, Gene said, "I have never told my Grandmother Proffitt that [the girls] were up there [at the jail] and no one came to pick them up. I figured she knew that she was supposed to be there; I couldn't figure out why they had not come." Gene also said that he had talked to his mother several times since the November 1975 hearing; that he had also talked to her on the two occasions she attended the wrestling matches; and that "on neither of these occasions did [he] ask her why there wasn't someone at the jail, and on none of the telephone conversations did [he] ever [tell] her . . . that the girls had been brought to the jail." He denied ever telling his mother that the two girls could not come on the fourth weekends. Gene also said on cross-examination, "[O]ne time that we had to visit, Grandmother did tell [Gambell] that she would not make her go if she didn't want to. We weren't going to force none of the kids into doing something against their will that we saw no cause to."

Gila, then "nine or ten years old and in the fourth grade," testified that Mrs. Clark had told her "once or twice" that she didn't have to visit her mother or Mrs. Proffitt if she didn't want to. Gambell was unable to remember whether Mrs. Clark had ever made similar statements to her.

Following the hearing Judge Lacey entered his order dated 4 June 1976. The pertinent part of his findings are summarized below (enumeration ours):

(1) Since November 24, 1975 Mrs. Clark has been hospitalized for "a diabetic condition, elevated blood sugar, a bladder infection, and cardiac insufficiency." She responded favorably to treatment and has been advised by her doctor to lead a normal life, free from any unnecessary stress.

(2) Defendant and her husband have moved from Weaverville to Knoxville, Tennessee, where they live in a two-story, five-bedroom home. As the children's natural mother she "is anxious

to have the children visit with her, and is a fit person to have liberal visitation privileges with her children."

(3) On the occasions since November 1975 when they have visited with defendant the children have had a good relationship with her, and there is no evidence of abuse or misconduct by defendant.

(4) On 29 November 1975 Mrs. Clark "did wilfully fail and refuse to deliver Gila and Gambell Clark to the Madison County Sheriff's Department in order to permit the defendant . . . to pick up the children for visitation as provided in the order dated November 24, 1975; and further that [Mrs. Clark] did advise Gambell Clark that she did not have to go to visit with her grandmother, Hazel Proffitt, on the postponed visit of the second week in February unless she wanted to go, and on other occasions the plaintiff had advised Gambell and Gila Clark that they did not have to visit with the defendant or the grandmother unless they wanted to, in violation of the order of November 24, 1975 and other orders of this court."

(5) Plaintiff continues to be a fit person to have the custody of the children and it is in their best interest that she continue to have their custody.

(6) Defendant is a fit and suitable person to visit with her children and to have liberal visitation privileges.

Upon the foregoing findings the court adjudged:

(1) By reason of the conduct specified in paragraph (4) above Mrs. Clark "is in contempt of this court. . . . The court does hereby withhold punishment for said contempt, but makes said findings as a part of the record herein."

(2) The care, custody and control of the children who are the subject of this proceeding continues in Mrs. Clark upon the following terms and conditions:

a. Gene and John Clark shall visit with defendant at such time as they shall determine.

b. Beginning 28 May 1976, and continuing thereafter, Gila and Gambell Clark shall be permitted, allowed and encouraged to visit with their mother on the fourth weekend of each calendar

month from 5:00 p.m. on Friday until 5:00 p.m. on Sunday. Further, they shall be allowed, permitted, and encouraged to visit with their mother during the summer vacation from 5:00 p.m. on Sunday afternoon, 18 July 1976 until Friday afternoon 13 August 1976.

Other provisions of the judgment "permitted, allowed, and encouraged" Gambell and Gila to visit their maternal grandmother during certain hours on the second Sunday of each month and with their mother during a part of the Thanksgiving and Christmas holidays. However, at the times specified for each visit the judgment required plaintiff to cause the two children to be transported to the Burger Plaza on the Marshall Bypass with proper "equipment" for visiting and there delivered to defendant or her mother, Mrs. Proffitt. At the termination of their visit defendant was ordered to return the children to the Burger Plaza to be delivered to Mrs. Clark or her designee.

Plaintiff appealed from the foregoing order to the Court of Appeals, which held that since Judge Lacey had not punished plaintiff for her contempt she was not aggrieved by the adjudication and therefore could not appeal from it. However, because the order lacked an explicit finding that the visitation privileges awarded defendant were in the best interest of the children, the Court of Appeals vacated those provisions of the judgment and remanded the cause "for proper findings and conclusions on this point." We allowed plaintiff's petition for discretionary review.

*Long, McClure & Dodd for plaintiff appellant.*

*Riddle & Shackelford for defendant appellee.*

SHARP, Chief Justice.

We consider first plaintiff's contentions that the trial court erred in finding her in contempt and that the Court of Appeals erred in holding that adjudication unappealable because, punishment having been withheld, she was not a party aggrieved.

[1]  With reference to her right to appeal plaintiff argues that the findings she had willfully disobeyed the court's orders providing for the custody of Gambell and Gila, if sustained, convict her of both civil contempt under G.S. 50-13.3 and criminal contempt under G.S. 5-1(4). Citing *Willis v. Power Co.*, 291 N.C. 19,

229 S.E. 2d 191 (1977) and *Rose's Stores v. Tarrytown Center,* 270 N.C. 206, 154 S.E. 2d 313 (1967), she asserts that G.S. 5-2 permits her to appeal the adjudication of contempt even though the court has imposed no punishment. Pointing to the provision of the judgment that plaintiff "is in contempt of this Court and . . . the Court does hereby withhold punishment for said contempt, but makes said Findings as a part of the record herein," plaintiff maintains that by "withholding" punishment for her adjudged contempt the court did not thereby waive, relinquish, or abandon the right to impose punishment at a later date. On the contrary, she insists, merely "to withhold" punishment without further limitation is to retain the right to impose it in the future, and under these circumstances the order holding her in contempt "affected a substantial right" and is therefore appealable. G.S. 1-271; G.S. 1-277.

The cited cases sustain plaintiff's contentions, and we hold that she was entitled to appeal the order adjudging her in contempt. Thus, the next question is whether the record supports the trial court's findings.

[2]  In contempt proceedings the judge's findings of fact are conclusive on appeal when supported by any competent evidence and are reviewable only for the purpose of passing on their sufficiency to warrant the judgment. *Rose's Stores v. Tarrytown Center, supra; Cotton Mill Co. v. Textile Workers Union,* 234 N.C. 545, 67 S.E. 2d 755 (1951); 3 Strong's North Carolina Index 3rd, *Contempt of Court* § 8 (1976). We hold that both direct and circumstantial evidence supports Judge Lacey's findings and affirm his adjudication that plaintiff is in contempt of court.

[3]  With reference to the court's finding that on 29 November 1975 plaintiff willfully refused to deliver Gila and Gambell to the Madison County Sheriff's Department so that defendant could pick them up in accordance with the court's order dated 24 November 1975, plaintiff contends that "there is no evidence she was aware of the existence or terms of the order." This contention will not withstand a scrutiny of the record, which contains evidence tending to show:

(1) At the conclusion of the hearing on 20 November 1975 Judge Lacey announced the terms of its judgment in open court. The judgment was signed on November 24th. It was filed on

November 26th and copies mailed to the attorneys for the parties. Defendant had her copy on November 29th.

(2) Plaintiff was in court on 20 November 1975 when Judge Lacey announced his ruling that thereafter Gambell and Gila would visit defendant the fourth weekend of each month, except that during the current month of November the visitation would be on the fifth weekend, just nine days away. The variation for November was made after Gene or one of the other children had called Mrs. Clark's attention to the fact that they had previously made plans for the fourth weekend.

(3) The children's testamentary guardian, their Uncle Cecil Clark, had also been at the November 1975 hearing and testified that he was familiar with the court's order. On cross-examination he recalled that at the end of the hearing Judge Lacey had announced that defendant was to have the children on the fifth weekend in November.

(4) Sheriff Ponder testified, without objection, that on the fifth weekend in November when defendant came to his jail for the children he called his sister, Mrs. Clark, and "she said she had not seen the order; it had never been presented to her."

(5) Gene Clark, then 15 years old, when asked on cross-examination if he could "give any reason why the two girls did not go to the jail on the fifth weekend in November like the judge had said in court?" replied, ". . . it seems like I recall something about we had not gotten a copy of the order saying that they were supposed to go on the fifth weekend."

From the evidence adduced the conclusion is inescapable that on 29 November 1975 Mrs. Clark, the children, and their testamentary guardian all had knowledge of the substance and meaning of the order which Judge Lacey enunciated on November 20th, signed on November 24th, and filed on November 26th, and that Mrs. Clark, using as an excuse the fact that she did not have a copy of the order in hand, willfully failed and refused to deliver the children as required by the order. Neither receipt of a copy of the order nor knowledge of its exact words were conditions precedent to her obligation to comply with it. *See Cotton Mills v. Local 584*, 251 N.C. 240, 147, 111 S.E. 2d 471, 475 (1959); 3 Strong's North Carolina Index 3rd, *Contempt of Court* § 3.1 (1977).

[4]   The court's finding that "[p]laintiff has advised Gambell and Gila Clark that they did not have to visit with the defendant or the Grandmother [Mrs. Proffitt] unless they wanted to, in violation of the Order of November 24, 1975, and other Orders of this Court" is likewise supported by competent record evidence. Gene testified that on at least one occasion plaintiff told Gambell she would not make her visit Mrs. Proffitt if the child didn't want to do it. He added, "We weren't going to force none of the kids into doing something against their will that we saw no cause to." Gila, then "nine or ten," testified that once or twice Mrs. Clark had told her that she would not have to make the visits against her will. When asked if plaintiff had ever told her she did not have to visit her mother if she didn't want to, and whether plaintiff had told John, Gila, and Gene not to go to Weaverville, Gambell, then eleven years old, replied that she could not remember. Further, Mrs. Proffitt testified that sometime early in 1976, in a telephone conversation, Mrs. Clark told her that she did not mind the children visiting with her and Mr. Proffitt, "but that they were not to go to Weaverville."

Plaintiff's assignment of error challenging the sufficiency of the evidence to support the trial court's finding that she had willfully violated the order of 24 November 1975 is overruled.

The record in this case tells a sad story. In August 1967 defendant left her husband and four children, then aged respectively eight, five, three, and two years, and for five years thereafter had no contact with them. During this time plaintiff assumed the role of mother; she gave them tender, loving care and a comfortable, secure home. The children lived happily with plaintiff and their father until his death in April 1972, and since then have lived with plaintiff. Understandably, they return plaintiff's affection and give her the love children customarily give their mother. Under these circumstances it is not surprising that plaintiff has been unwilling to share the children with their mother and has resented, and attempted to thwart, defendant's efforts to reestablish a mother's relationship with the children, as well as the court's efforts to assist defendant in doing so.

The two judges before whom this controversy has come have at all times recognized the bond of affection between plaintiff and the children and that plaintiff has earned the right to their

primary custody. With judgmatical objectivity, however, the judges have weighed a consideration which plaintiff obviously has not permitted herself to contemplate: Her life expectancy is less than defendant's, and it is not in the children's interest that the court ignore the possibility of plaintiff's disablement or death prior to the majority of one or more of them. The testimony of her physician that she is overweight and now suffering from diabetes, high blood pressure, coronary artery insufficiency and anginal attacks corroborates that possibility and supports its probability.

From the beginning of this litigation the judges have recognized that while it was best for the children to remain in the custody of their grandmother, it was also in their interest "to have frequent visits, contacts and associations with their natural mother," and since her marriage, with her husband. After the entry of the order of 11 August 1972, defendant, albeit a resident of Alabama for over two years, and despite great expense, journeyed to Madison County every month she was allowed to visit her children, telephoned them frequently, and "generally did all she reasonably could to demonstrate her love for the children and to win their love and affection." The children responded, and warm and affectionate relations developed between them and their mother and stepfather.

However, the factual findings contained in the judgments indicate that plaintiff's hostility and antagonism toward defendant increased as defendant's personal situation and status improved, and the court increased her visitation privileges. Inevitably plaintiff's attitude and conduct were reflected in the attitude and conduct of the children toward defendant. In consequence, on 13 August 1975, Judge Lacey directed that until the further orders of the court the children should be allowed to visit defendant at any time they desired but not be compelled to visit her. Three and one-half months later, upon a finding that the children had not visited defendant since the entry of the August order, on 24 November 1975 Judge Lacey ordered once-a-month compulsory visitations with defendant and with Mrs. Proffitt. *Inter alia*, in consequence of plaintiff's willful violations of the November order, her deteriorating physical condition, and the children's improved relations with their mother, on 4 June 1976 Judge Lacey entered the order under review.

With reference to this order plaintiff contends (1) that the visiting privileges awarded defendant in the judgment of 4 June 1976 cannot be sustained because they are unsupported by either a finding that changed conditions justified the visitations specified or that these visitations are in the best interest of the children; and (2) that the Court of Appeals erred in holding that under its decision in *Clark v. Clark*, 23 N.C. App. 589, 209 S.E. 2d 545 (1974), which "stands as the law of [this] case," defendant is not required to show changed conditions in order to secure a modification of her visitation privileges. *See* 3 Lee, North Carolina Family Law § 226 (Cum. Supp. 1976). We consider first contention (2). *See Spartan Leasing, Inc. v. Brown*, 285 N.C. 689, 208 S.E. 2d 649 (1974); *Peaseley v. Virginia Iron, Coal & Coke Co.*, 282 N.C. 585, 194 S.E. 2d 133 (1973).

[5] In the consent judgment of 11 August 1972, the first order entered in this cause, the court retained the proceeding "for further orders and particularly for entry of special order further specifying the visiting privileges of the defendant . . . , which said special order only may be entered without showing of change of condition but . . . only after appropriate notice." In both *Clark v. Clark, supra,* and its unpublished decision from which plaintiff now appeals, the Court of Appeals held that the above-quoted provision estops plaintiff from raising the issue of changed conditions. We agree with plaintiff that the Court of Appeals erred in making this ruling.

[5, 6] An agreement by the parties that the court may change visitation privileges in a custody order without any showing of changed conditions does not relieve the court of its duty to determine whether changed circumstances affecting the welfare of the child justify a modification. It is clear that "the modification of a custody decree must be supported by findings of fact based on competent evidence that there has been a substantial change of circumstances affecting the welfare of the child, and the party moving for such modification assumes the burden of showing such change of circumstances." *Blackley v. Blackley*, 285 N.C. 358, 362, 204 S.E. 2d 678, 681 (1974). G.S. 50-13.7(a) (Replacement 1976) provides that "[a]n order of a court of this State for custody . . . of a minor child may be modified at any time, upon motion in the cause and a showing of changed circumstances by either party or anyone interested." Visitation privileges are but a lesser degree

Clark v. Clark

of custody. Thus, we hold that the word "custody" as used in G.S. 50-13.7 was intended to encompass visitation rights as well as general custody. As Justice Branch said in *Shepherd v. Shepherd*, 273 N.C. 71, 75, 159 S.E. 2d 357, 361 (1968) with reference to the rule that a change in custody requires a finding of changed circumstances, "to hold otherwise would invite constant litigation by a dissatisfied party so as to keep the involved child in a resulting state of turmoil and insecurity. This in itself would destroy the paramount aim of the court, that is, that the welfare of the child be promoted and subserved."

Notwithstanding, the error in *Clark v. Clark, supra*, has no significance on this appeal because the order of 6 June 1976 contains findings of changed circumstances affecting the welfare of the children which, were the issue of changed conditions decisive on this appeal, would suffice to sustain the visitation award. Indeed, the order in *Clark v. Clark*, and in each order entered after the August 1972 judgment, the court made findings demonstrating one or more significant changes in circumstances affecting the welfare of the children and justifying the changes made.

[7] Plaintiff's contention (based on her assignment of error No. 19) that the visitations ordered in the judgment of 4 June 1976 are not supported by a finding that required visits are in the children's best interest must be sustained. The Court of Appeals correctly held that the case must be remanded for proper findings and conclusions on this issue.

[8] In view of the time which will have elapsed since the order of 4 June 1976 the trial judge will, without undue delay, conduct a plenary hearing. Thereafter he will make such order with reference to the custody of the infant children, and visitation rights incident to the award of their custody, as he shall determine to be in their best interest under the conditions then prevailing. The ages of these children render it appropriate and desirable for the judge to ascertain and consider their wishes in respect to their custody. As stated in 3 Lee, North Carolina Family Law, § 224:

"When the child has reached the age of discretion, the court may consider the preference or wishes of the child to live with a particular person. A child has attained an age of discretion when

it is of an age and capacity to form an intelligent or rational view on the matter. The expressed wish of a child of discretion is, however, never controlling upon the court, since the court must yield in all cases to what it considers to be for the child's best interests, regardless of the child's personal preference. . . . The preference of the child should be based upon a considered and rational judgment, and not made because of some temporary dissatisfaction or passing whim or some present lure."

Reversed in part; affirmed in part; and remanded.