An unpublished opinion of the North Carolina Court of Appeals does not constitute controlling legal authority. Citation is disfavored, but may be permitted in accordance with the provisions of Rule 30(e)(3) of the North Carolina Rules of Appellate Procedure.

IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-318

Filed 15 April 2026

Onslow County, No. 23CVD001859-660

NATHAN PHILLIPS, Plaintiff,

v.

JILLIAN ORMSBEE, Defendant,

v.

GERRY & JENNIFER PHILLIPS, Intervenors.

Appeal by Defendant from order entered on 4 October 2024 by Judge Christopher J. Welch in Onslow County District Court. Heard in the Court of Appeals 14 August 2025.

*Hayes Law Offices, PLLC, by Mark L. Hayes, for Defendant-Appellant.*

*No briefs filed on behalf of Plaintiff-Appellee or Intervenors-Appellees.*

CARPENTER, Judge.

Jillian Ormsbee ("Mother") appeals from the trial court's 4 October 2024 child custody and support order (the "Order") awarding joint legal and physical custody of the minor child, Stella, to Mother and Nathan Phillips ("Father") and granting

visitation to Gerry and Jennifer Phillips (collectively, "Paternal-Grandparents"). On appeal, Mother argues: (1) the trial court erred by authorizing Paternal-Grandparents to exercise visitation during Father's parenting time over Mother's objection; (2) the evidence and findings did not support joint legal and physical custody; and (3) the trial court miscalculated the child support award. After careful review, we affirm.

## I. Factual & Procedural Background

On 14 July 2023, the trial court entered a temporary custody order granting Mother primary custody of Stella. The trial court also granted Father visitation with Stella three weekends per month and an additional weeknight during the weeks Mother had Stella for the weekend. On 30 September 2024, Paternal-Grandparents filed a motion to intervene, and, on 3 October 2024, Paternal-Grandparents filed a motion for visitation. That same day, the trial court allowed Paternal-Grandparents' motion to intervene and proceeded to a hearing on the issues of custody and visitation. Evidence from the hearing tended to show the following.

Mother and Father are the biological parents of Stella, born in November 2022. For the first seven months of her life, Stella lived with Mother and Father in Jacksonville, North Carolina. During this time, Mother and Father did not allow Paternal-Grandparents to spend time with Stella. Father only agreed to limiting Paternal-Grandparents' involvement with Stella, however, because he "felt like [he] had to" based on Mother's wishes. When Mother and Father ended their relationship

around June 2023, Father moved into his own apartment and, when visiting with Stella, regularly allowed her to spend time with Paternal-Grandparents.

Until May 2024, Paternal-Grandparents cared for Stella during a majority of Father's custodial time. Father occasionally visited Stella at Paternal-Grandparents' home, and Stella did not spend most overnights with Father. When Paternal-Grandmother experienced a health event, however, Father became more involved in Stella's care. Father began to routinely pick up Stella from Paternal-Grandparents' home on Friday evenings after work and care for Stella throughout the weekend. According to Paternal-Grandmother, Father had "done [an] amazing job" parenting Stella since having to "step[] up to the plate."

As of the hearing, Mother and Father were both employed and had stable housing. Mother worked at a grocery store with varying shifts. When Mother was at work, her parents took care of Stella. Mother's parents had a loving relationship with Stella. When Mother was not working, she spent all her time at home with Stella. Mother and Stella had a loving relationship. Mother lived with her parents in a two-story home with four bedrooms. Stella slept in a crib in Mother's room.

Father drove trucks Monday through Friday. He began work at 5:00 a.m. and finished anywhere between 6:30 p.m. and 8:00 p.m. Father lived in a four-bedroom home in a rural area with his girlfriend, three of her children, and Stella. Stella had her own bedroom at Father's home, and Stella could play with other children from a

nearby community. Father and Stella had a loving relationship. Mother had met Father's girlfriend and had seen the girlfriend interacting with Stella.

Paternal-Grandparents lived in a three-bedroom home on a twenty-five-acre parcel in Swansboro, North Carolina. When spending the night, Stella slept in the living room because the other bedrooms were too far away from Paternal-Grandparents' bedroom. Stella had a loving relationship with Paternal-Grandparents. Additionally, Stella spent time with Father's extended family when she visited with Paternal-Grandparents.

During the hearing, Mother expressed doubts that she and Father could successfully co-parent because they had "never been able to agree on anything." Mother opposed having both parents present at Stella's medical appointments. When asked whether she believed it was in Stella's best interest to have a relationship with Father and his side of the family, Mother responded, "To a point. If he actually participated as her dad like he's supposed to, yes. But he has not." When asked if it was important for Stella to have a relationship with Paternal-Grandparents, Mother responded, "Not the way it's been. [Paternal-Grandmother] can still see [Stella]. I don't mind her seeing her. I just want it a certain way. And she can earn more time under my terms."

Mother generally opposed Stella seeing Father's family because Stella would be "exposed to all the violence that they do." Mother recounted a domestic incident at Paternal-Grandparents' home in March 2022. According to Mother, she and

Father arrived at Paternal-Grandparents' home one evening to find Father's brother and Paternal-Grandfather "out back fighting." When Father's brother and Paternal-Grandfather "started beating" Father, Mother intervened and "swung on [Father's] brother with the backend of a gun . . . ." Father's brother "grabbed the gun [and] pointed it at [Mother]," and Paternal-Grandfather purportedly instructed Father's brother to "[b]low her f-ing head off." Mother did not report the incident to law enforcement.

Paternal-Grandparents acknowledged a breakdown in communication with Mother. Mother would not speak to Paternal-Grandmother during custodial exchanges. Further, Paternal-Grandmother was unable to reach Mother on several occasions because Mother "blocked" Paternal-Grandmother's calls and texts.

On 4 October 2024, the trial court entered the Order awarding Mother and Father joint legal and equal physical custody and authorizing Paternal-Grandparents' visitation with Stella during Father's custodial time over Mother's objection. The trial court made the following pertinent findings of fact:

> 7. There is limited evidence as to the relationship between [the girlfriend], her children and Stella, but there is no evidence to suggest anything harmful or negative or that the contact between Stella and [Father's] girlfriend is against Stella's best interest.
> . . .
>
> 15. The most significant concern regarding [Mother] is her hostility towards [Father] and his family.

16. There is no competent evidence in support of [Mother's] contention that [Father] and [Paternal-Grandparents] pose a danger to [Stella] or that contact with them would be harmful to Stella.

17. All three parties to the action . . . are fit and proper for the award of custody of the minor child.

18. Both parties have provided appropriate attention to her needs.

The trial court clarified that Paternal-Grandparents' visitation was "to be exercised during periods of custody . . . already awarded to [Father.]" The trial court further provided that "no grandparent visitation is to be construed to reduce the period of physical custody of [Mother.]"

Utilizing the presumptive guidelines (the "Child Support Guidelines"), specifically Worksheet B, the trial court determined that Father was to pay Mother $387 each month for child support. Additionally, Mother and Father would split Stella's unreimbursed or uninsured medical and dental expenses equally. On 30 October 2024, Mother filed written notice of appeal.

## II. Jurisdiction

As an initial matter, we consider our jurisdiction to address Mother's appeal. An appellant must include in their brief a statement of the grounds for appellate review identifying the jurisdictional basis for appellate review. *See* N.C. R. App. P. 28(b)(4) (2025). Because the "Rules of Appellate Procedure are mandatory[,] failure to comply with these rules subjects an appeal to dismissal." *Bledsoe v. Cnty. of Wilkes*,

135 N.C. App. 124, 125, 519 S.E.2d 316, 317 (1999). A default under Rule 28(b), however, constitutes a nonjurisdictional violation. *Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co*, 362 N.C. 191, 198, 657 S.E.2d 361, 365 (2008). Thus, dismissal is not an appropriate sanction unless the appellant's nonjurisdictional defaults are "egregious." *Id.* at 200, 657 S.E.2d at 366.

Here, Mother failed to include a statement of the grounds for appellate review in her brief. *See* N.C. R. App. P. 28(b)(4). Mother's single, nonjurisdictional rule violation, however, is not so egregious as to impair appellate review or frustrate the adversarial process. *See Dogwood Dev. & Mgmt. Co., LLC*, 362 N.C. at 200, 657 S.E.2d at 366. Accordingly, we have jurisdiction under N.C. Gen. Stat. § 7A-27(b)(2) (2025).

### III. Issues

The issues are whether: (1) the trial court erred by authorizing Paternal-Grandparents to exercise visitation during Father's parenting time over Mother's objection; (2) the evidence and findings supported joint legal and physical custody; and (3) the trial court miscalculated the child support award.

### IV. Analysis

#### A. Visitation

First, Mother contends the trial court erred by granting visitation to Paternal-Grandparents, over her objection, during Father's parenting time. Mother advances three arguments in support of her assertion: (1) the visitation was "so extensive" that

it amounted to an improper grant of custody; (2) the amount of visitation violated Mother's constitutionally-protected status as a parent; and (3) the trial court erred by giving Father and Paternal-Grandparents the power to unilaterally modify their custody and visitation schedule. We disagree.

"The standard of review for a child custody proceeding is abuse of discretion." *Velasquez v. Ralls*, 192 N.C. App. 505, 506, 665 S.E.2d 825, 826 (2008). An abuse of discretion occurs if the trial court's decision is " 'manifestly unsupported by reason, or so arbitrary that it could not have been the result of a reasoned decision.' " *Stephens v. Stephens*, 213 N.C. App. 495, 503, 715 S.E.2d 168, 174 (2011) (quoting *Mark Grp. Int'l, Inc. v. Still*, 151 N.C. App. 565, 566, 566 S.E.2d 160, 161 (2002)).

Under the United States Constitution, natural parents have a "liberty interest in the companionship, custody, care, and control of his or her child." *Price v. Howard*, 346 N.C. 68, 74, 484 S.E.2d 528, 531 (1997). This right, however, "is not absolute." *Adams v. Tessener*, 354 N.C. 57, 61, 550 S.E.2d 499, 502 (2001) (citations omitted).

A parent's custody of a minor child generally includes some combination of physical care and legal custody, while visitation is something "lesser" than custody. *See Clark v. Clark*, 294 N.C. 554, 575–76, 243 S.E.2d 129, 142 (1978). Specifically, legal custody empowers a parent or guardian with " 'the right and responsibility to make decisions with important and long-term implications for a child's best interest and welfare.' " *Peters v. Pennington*, 210 N.C. App. 1, 17, 707 S.E.2d 724, 736 (2011) (quoting *Diehl v. Diehl*, 177 N.C. App. 642, 646, 630 S.E.2d 25, 27 (2006)).

Moreover, the trial court may grant visitation rights to a grandparent if it is in the child's best interests. N.C. Gen. Stat. § 50-13.2A (2025). A trial court's visitation award to a grandparent may be unconstitutional if "it impermissibly interferes with the parent-child relationship . . . ." *Alexander v. Alexander*, 276 N.C. App. 148, 156, 856 S.E.2d 136, 142 (2021). In other words, a trial court cannot "essentially award[] [grandparents] secondary custody instead of visitation." *Id.* at 156 n.7, 856 S.E.2d at 142 n.7.

Here, the trial court's legal custody decision regarding Paternal-Grandparents' visitation was not arbitrary or impermissible. *See id.* at 156, 846 S.E.2d at 142; *see also Stephens*, 213 N.C. App. at 503, 715 S.E.2d at 174. Because Father shared joint legal custody of Stella with Mother, any authorized visitation with Paternal-Grandparents during Father's parenting time did not essentially award them with secondary custody. *See Alexander*, 276 N.C. App. at 156 n.7, 856 S.E.2d at 142 n.7. Indeed, Mother and Father remained Stella's primary legal and physical custodians. *See Price*, 346 N.C. at 74, 484 S.E.2d at 531. The Order did not vest Paternal-Grandparents with legal custody rights, such as decisions "with important and long-term implications for [Stella's] best interest and welfare." *See Peters*, 210 N.C. App. at 17, 707 S.E.2d at 736. Paternal-Grandparents' right to visit with Stella during Father's parenting time, therefore, does not constitute an impermissible grant of custody. *See Clark*, 294 N.C. at 575–76, 243 S.E.2d at 142.

Paternal-Grandparents' visitation also does not impermissibly interfere with Mother's parental relationship with Stella or reduce Mother's physical custody time. *See Alexander*, 276 N.C. App. at 156, 856 S.E.2d at 142; *see also Price*, 346 N.C. at 74, 484 S.E.2d at 531. In fact, the trial court explicitly restricted Paternal-Grandparents' visitation to Father's physical custody time. Paternal-Grandparents' visitation, therefore, does not interfere with Mother's parental rights. *See Alexander*, 276 N.C. App. at 156, 856 S.E.2d at 142.

Consequently, because the trial court did not award Paternal-Grandparents with custody over Stella and did not impermissibly interfere with Mother's parental status, the trial court did not abuse its discretion in awarding visitation to Paternal-Grandparents during Father's custodial time. *See Velasquez*, 192 N.C. App. at 506, 665 S.E.2d at 826. Rather, the trial court's reasoned decision removed a contentious issue from the realm of possible disputes between joint legal custodians.

**B. Custody**

Next, Mother argues the trial court erred by awarding Father equal physical custody of Stella because its findings failed to support its conclusion. Mother specifically challenges Findings of Fact 7, 15, 16, 17, and 18. We disagree.

In reviewing a child custody order, we consider " 'whether there was competent evidence to support the trial court's findings of fact and whether its conclusions of law were proper in light of such facts.' " *Burger v. Smith*, 243 N.C. App. 233, 236, 776 S.E.2d 886, 888–89 (2015) (quoting *Barker v. Barker*, 228 N.C. App. 362, 364, 745

S.E.2d 910, 912 (1992))). " 'Unchallenged findings of fact are binding on appeal.' " *Id.* at 236, 776 S.E.2d at 889 (quoting *Peters*, 210 N.C. App. at 12–13, 707 S.E.2d at 733). Findings supported by competent evidence, even if there is sufficient evidence to support findings to the contrary, are conclusive on appeal. *Id.* at 236, 776 S.E.2d at 889.

The question of " 'whether [the trial court's] findings of fact support [its] conclusions of law is reviewable *de novo*.' " *Id.* at 236, 776 S.E.2d at 889 (alteration in original) (quoting *Hall v. Hall*, 188 N.C. App. 527, 530, 655 S.E.2d 901, 904 (2008)). " 'Under a *de novo* review, [this Court] considers the matter anew and freely substitutes its own judgment for that of the lower tribunal.' " *Deanes v. Deanes*, 294 N.C. App. 29, 37, 901 S.E.2d 880, 886 (2024) (quoting *Wellons v. White*, 229 N.C. App. 164, 173, 748 S.E.2d 709, 717 (2013)).

Ultimately, in matters of child custody, "the trial court is vested with broad discretion . . . ." *Pulliam v. Smith*, 348 N.C. 616, 624, 501 S.E.2d 898, 902 (1998) (citation omitted). "Absent an abuse of discretion, the trial court's decision in matters of child custody should not be upset on appeal," *Everette v. Collins*, 176 N.C. App. 168, 171 625 S.E.2d 796, 798 (2006) (citation omitted), especially regarding "custody based on the best interest of the child test," *Adams*, 354 N.C. at 61, 550 S.E.2d at 502 (internal quotation marks and citation omitted).

### 1. Finding of Fact 7

Here, Finding of Fact 7 states that "[t]here is limited evidence as to the relationship between [the girlfriend], her children and Stella, but there is no evidence to suggest anything harmful or negative or that contact between Stella and [Father's] girlfriend is against Stella's best interest." Mother argues that the trial court did not have enough information about Father's girlfriend to make this finding. We disagree.

Mother testified that she had met Father's girlfriend and that she had seen Father's girlfriend interact with Stella. Despite having the ability to do so, Mother did not inquire into the girlfriend or raise any concerns regarding the girlfriend's suitability to be around Stella. Further, none of the parties presented any evidence of negative interactions between Father's girlfriend, the girlfriend's children, and Stella. Finding of Fact 7, therefore, is supported by competent evidence. *See Burger*, 243 N.C. App. at 236, 776 S.E.2d at 889.

### 2. Finding of Fact 15

Finding of Fact 15 states that Mother exhibited hostility toward Father and his family. Mother asserts that she never testified that contact with Paternal-Grandparents would harm Stella. We disagree.

Mother testified that she and Father could not "agree on anything," she had negative impressions of Paternal-Grandparents and Father's involvement with Stella, she wanted Paternal-Grandmother to "earn more time [with Stella] under [Mother's] terms[,]" and she did not believe it was in Stella's best interest for Father to attend Stella's medical appointments. Paternal-Grandmother also stated there

had been a breakdown in communication between Mother and Paternal-Grandparents, including that Mother refused to speak with Paternal-Grandmother during custodial exchanges and "block[ed]" Paternal-Grandmother's calls and texts on several occasions. Thus, Finding of Fact 15 is supported by competent evidence. *See id.* at 236, 776 S.E.2d at 889.

### 3. Finding of Fact 16

Finding of Fact 16 states, "There is no competent evidence in support of [Mother's] contention that [Father] and [Paternal-Grandparents] pose a danger to [Stella] or that contact with them would be harmful to Stella." Mother argues that she provided competent evidence of violence. We disagree.

Apart from Mother's testimony regarding the isolated, unreported incident of violence purportedly occurring in March 2022, no other evidence tends to demonstrate that Father or his family presented any threat to Stella's safety. *See id.* at 236, 776 S.E.2d at 889. On the contrary, Paternal-Grandparents testified at length as to the care they provided for Stella and the loving relationship they shared with her. Finding of Fact 16, therefore, is supported by competent evidence. *See id.* at 236, 776 S.E.2d at 889.

### 4. Finding of Fact 17

Finding of Fact 17 states that all three parties are fit and proper for custody of Stella. Mother contends that Father provided no evidence of providing care for Stella. We disagree.

- 13 -

Mother does not challenge the trial court's findings that Father was employed, lived in an appropriate home, "spent a mu[ch] greater share of his custodial time keeping his daughter[,]" and "provide[d] a nurturing and positive environment for [Stella] while she [was] in [his] care." These unchallenged findings support Finding of Fact 17 and are binding on appeal. *See id.* at 236, 776 S.E.2d at 889.

### 5. Finding of Fact 18

Finding of Fact 18 states that both Mother and Father "have provided appropriate attention to [Stella's]needs." Mother argues that Father did not provide evidence of his attention to Stella's care. We disagree.

Despite initially allowing Mother and Paternal-Grandparents to serve as Stella's primary caregivers, Father took on more responsibility and played a larger role in Stella's life in the year before the hearing. Paternal-Grandmother testified that Father had "done [an] amazing job" parenting Stella and that Stella "love[d] her daddy." Father expressed his love for Stella and characterized their relationship as caring and affectionate. Finding of Fact 18, therefore, is supported by competent evidence. *See id.* at 236, 776 S.E.2d at 889.

### 6. Conclusions of Law

Because the evidence supports the challenged findings, they are conclusive on appeal. *See id.* at 236, 776 S.E.2d at 889. The findings show that Father's girlfriend did not negatively impact Stella, Father did not pose a danger to Stella, Father had provided appropriate attention to Stella's needs, and Father was fit for custody.

These findings, therefore, were sufficient to support the trial court's conclusion that the joint legal and physical custody award was in Stella's best interest. *See Adams*, 354 N.C. at 61, 550 S.E.2d at 502. Accordingly, the trial court's custody decision was not manifestly unsupported by reason or arbitrary. *See Burger*, 243 N.C. App. at 236, 776 S.E.2d at 889.

Mother also argues that, if the trial court erred by awarding joint physical custody, it should recalculate the child support award to reflect the appropriate number of overnights. As the trial court did not err by awarding joint physical custody or abuse its discretion in the visitation arrangement, this alternative argument is moot.

**V. Conclusion**

In sum, the trial court's findings of fact are supported by competent evidence, its findings of fact support its conclusions of law, and the trial court did not abuse its discretion by awarding joint legal and physical custody of Stella to Father and Mother, authorizing visitation to Paternal-Grandparents during Father's custodial time, or calculating child support. Accordingly, we affirm the Order.

AFFIRMED.

Judges TYSON and ARROWOOD concur.

Report per Rule 30(e).