IN THE SUPREME COURT OF NORTH CAROLINA

No. 301A19

Filed 17 July 2020

IN THE MATTER OF: M.A., B.A., A.A.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from an order entered on 7 May 2019 by Judge Denise S. Hartsfield in District Court, Forsyth County. This matter was calendared for argument in the Supreme Court on 19 June 2020 but was determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

> *Theresa A. Boucher, Assistant County Attorney, for petitioner-appellee Forsyth County Department of Social Services.*
>
> *Michelle FormyDuval Lynch, GAL Appellate Counsel, for appellee Guardian ad Litem.*
>
> *Mary McCullers Reece for respondent-appellant father.*
>
> *Richard Croutharmel for respondent-appellant mother.*

ERVIN, Justice.

Respondent-father Earl A. and respondent-mother Peggy A. appeal from an order entered by the trial court terminating their parental rights in their minor children M.A., B.A., and A.A.[1] After careful consideration of the parents' challenges

---

[1] M.A., B.A., and A.A. will, respectively, be referred to throughout the remainder of this opinion as "Maria," "Brenda," and "Andrew," which are pseudonyms used to protect the juveniles' identities and for ease of reading.

to the trial court's termination order, we conclude that the order in question should be affirmed.

## I. Factual Background

On 2 August 2017, the Forsyth County Department of Social Services filed petitions alleging that Maria, Brenda, and Andrew were neglected juveniles and obtained the entry of orders placing the children in nonsecure custody.[2] In these petitions, DSS alleged that substance abuse and domestic violence in the presence of the children had caused it to offer in-home services to the family and to subsequently seek to have the children removed from the family home. In addition, the petitions alleged that DSS had had extensive prior dealings with the children's family, including their placement in DSS custody from 19 April 2011 through 6 November 2012, and the fact that they had been the subject of a prior adjudication of neglect.[3]

The petitions came on for hearing before the trial court on 21 March 2018. On 30 May 2018, the trial court entered an order determining that the children were

---

[2] In addition, DSS obtained nonsecure custody of respondent-mother's oldest son, A.J., who will be referred to throughout the remainder of this opinion as "Adam." Respondent-father is not Adam's father. In view of the fact that any issues concerning DSS' involvement with Adam are not before the Court in connection with this appeal, we will refrain from discussing those issues in the remainder of this opinion.

[3] The children were adjudicated to be neglected juveniles due to domestic violence and substance abuse by means of an order entered by the trial court on 4 August 2011. However, the Court of Appeals reversed the trial court's adjudication order and remanded that case to the District Court, Forsyth County, for further proceedings. *In re M.A.*, No. COA11-1238, 2012 WL 1316378 (N.C. Ct. App. April 17, 2012) (unpublished). On remand, the trial court entered an order on 25 July 2012 finding the children to be neglected juveniles on the basis of domestic violence and substance abuse.

neglected juveniles "in that they received improper care and supervision from [the parents] and [ ] were allowed to live in an environment injurious to their wellbeing." The trial court's order detailed ongoing instances of domestic violence and substance abuse that had occurred in the presence of the children despite the fact that the parents had entered into a family services agreement with DSS that prohibited such conduct. As a precondition for allowing them to reunify with the children, the trial court ordered the parents to obtain substance abuse and domestic violence assessments and follow all resulting treatment recommendations; "[s]ubmit to random drug testing"; "[e]ngage in supervised visits with [the] children and demonstrate consistency and safe parenting skills during visits"; "[e]stablish and maintain stable, safe, adequate housing to meet [the] children's basic needs"; and notify DSS "of any change in residency, telephone number, or employment." In addition, respondent-father was ordered to "[p]rovide [DSS] with names of all physicians . . . prescribing him controlled substances" and to "[s]ign releases to all doctors providing treatment for him[.]"

After a permanency planning hearing held on 11 June 2018, the trial court entered an order on 11 July 2018 that established the primary permanent plan for all three children as adoption, with a secondary permanent plan of guardianship. In addition, the trial court ordered the cessation of efforts to reunify the parents with

the children and instructed DSS to file petitions seeking to have the parents' parental

rights in the children terminated.[4]

On 14 August 2018, DSS filed a petition seeking to have the parents' parental

rights in the children terminated based upon neglect and willful failure to make

reasonable progress toward correcting the conditions that led to the children's

removal from the family home. *See* N.C.G.S. § 7B-1111(a)(1)–(2) (2019). The

termination petition came on for hearing before the trial court on 4 February 2019.

On 7 May 2019, the trial court entered an order terminating both parents' parental

rights in the children on the basis of both grounds for termination alleged in the

termination petition. In addition, the trial court concluded that termination of the

parents' parental rights would be in the children's best interests. The parents noted

an appeal to this Court from the trial court's termination order.[5] In seeking relief

from the trial court's termination order before this Court, respondent-father argues

that the trial court erred by finding that grounds existed to support the termination

of his parental rights in the children while respondent-mother argues that the trial

court erred by determining that termination of her parental rights would be in the

children's best interests.

---

[4] The parents filed notices preserving their right to seek appellate review of the 11 July 2018 order by the Court of Appeals pursuant to N.C.G.S. §§ 7B-1001(a)(5).

[5] Although the parents noted appeals to this Court from the 11 July 2018 order, they have not contended in their briefs that the challenged order is legally erroneous, thereby abandoning any challenge that they might have otherwise been entitled to make to the lawfulness of that order. *See* N.C.R. App. P. 28(b)(6).

## II. Legal Analysis

### A. Standard of Review

According to well-established North Carolina law, termination of parental rights proceedings involve the use of a two-stage process. N.C.G.S. §§ 7B-1109, -1110 (2019). "At the adjudicatory stage, the petitioner bears the burden of proving by 'clear, cogent, and convincing evidence' the existence of one or more grounds for termination under section 7B-1111(a) of the General Statutes." *In re A.U.D.*, 373 N.C. 3, 5–6, 832 S.E.2d 698, 700 (2019) (quoting N.C.G.S. § 7B-1109(f)). "If [the trial court] determines that one or more grounds listed in section 7B-1111 are present, the court proceeds to the dispositional stage, at which the court must consider whether it is in the best interests of the juvenile[s] to terminate parental rights." *In re D.L.W.*, 368 N.C. 835, 842, 788 S.E.2d 162, 167 (2016) (citing *In re Young*, 346 N.C. 244, 247, 485 S.E.2d 612, 614–15 (1997); N.C.G.S. § 7B-1110).

### B. Respondent-Father's Appeal

As an initial matter, we will address respondent-father's contention that the trial court erred by determining that his parental rights in the children were subject to termination pursuant to N.C.G.S. § 7B-1111(a)(1) and (2). "This Court reviews a trial court's adjudication decision pursuant to N.C.G.S. § 7B-1109 in order to determine whether the findings are supported by clear, cogent and convincing evidence and the findings support the conclusions of law, with the trial court's conclusions of law being subject to de novo review on appeal." *In re N.D.A.*, 373 N.C.

71, 74, 833 S.E.2d 768, 771 (2019) (cleaned up) (citations omitted). "Findings of fact not challenged by respondent are deemed supported by competent evidence and are binding on appeal." *In re T.N.H.*, 372 N.C. 403, 407, 831 S.E.2d 54, 58 (2019) (citing *Koufman v. Koufman*, 330 N.C. 93, 97, 408 S.E.2d 729, 731 (1991)). "Moreover, we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights." *Id.* at 407, 831 S.E.2d at 58–59 (citing *In re Moore*, 306 N.C. 394, 404, 293 S.E.2d 127, 133 (1982)). "[A] finding of only one ground is necessary to support a termination of parental rights." *In re A.R.A.*, 373 N.C. 190, 194, 835 S.E.2d 417, 421 (2019).

According to N.C.G.S. § 7B-1111(a)(1), a trial judge may terminate a parent's parental rights in a child in the event that it finds that the parent has neglected his or her child in such a way that the child has become a neglected juvenile as that term is defined in N.C.G.S. § 7B-101. N.C.G.S. § 7B-1111(a)(1) (2019). A neglected juvenile is "[a]ny juvenile less than 18 years of age . . . whose parent . . . does not provide proper care, supervision, or discipline" or "who lives in an environment injurious to the juvenile's welfare." *Id.* § 7B-101(15).

> [I]n deciding whether a child is neglected for purposes of terminating parental rights, the dispositive question is the fitness of the parent to care for the child at the time of the termination proceeding. In the event that a child has not been in the custody of the parent for a significant period of time prior to the termination hearing, requiring the petitioner in such circumstances to show that the child is currently neglected by the parent would make termination of parental rights impossible. In such circumstances, the

> trial court may find that a parent's parental rights in a
> child are subject to termination on the grounds of neglect
> in the event that the petitioner makes a showing of past
> neglect and a likelihood of future neglect by the parent.

*In re N.D.A.*, 373 N.C. at 80, 833 S.E.2d at 775 (cleaned up) (citations omitted). "When determining whether future neglect is likely, the trial court must consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing." *In re Z.A.M.*, 374 N.C. 88, 95, 839 S.E.2d 792, 797 (2020) (citing *In re Ballard*, 311 N.C. 708, 715, 319 S.E.2d 227, 232 (1984)). "A parent's failure to make progress in completing a case plan is indicative of a likelihood of future neglect." *In re M.J.S.M.*, 257 N.C. App. 633, 637, 810 S.E.2d 370, 373 (2018) (citation omitted).

In light of the testimony, prior orders, and a report prepared by the guardian ad litem that was introduced into evidence at the termination hearing, the trial court found that "[respondents], the parents of [Maria], [Brenda] and [Andrew,] have neglected their children" and that "[t]here is a strong probability of repeated neglect of [Maria], [Brenda] and [Andrew] should they be returned to the care[,] custody[,] and control of [respondents]." In support of these ultimate findings, the trial court made numerous evidentiary findings concerning the progress that respondent-father had made toward satisfying the requirements of his case plan in the course of concluding that the progress that he made toward the achievement of that goal had not been reasonable.

Although respondent-father acknowledges the existence of the trial court's earlier determination that the children were neglected juveniles, he challenges its finding that there was a substantial probability that the children would be neglected in the event that they were returned to his care. Among other things, respondent-father argues that the challenged trial court finding was erroneous because he had "made reasonable progress in addressing substance use, domestic violence, and maintenance of a stable home and income." In support of this contention, respondent-father asserts that several of the trial court's factual findings lack sufficient evidentiary support to the extent that they indicate that he had failed to make reasonable progress toward satisfying the requirements of his case plan. A careful review of the record persuades us that the trial court's findings concerning respondent-father's failure to adequately address the issue of domestic violence have ample evidentiary support and are, standing alone, sufficient to support a determination that there was a likelihood of future neglect in the event that the children were returned to respondent-father's care.

Respondent-father acknowledges that the trial court identified domestic violence as the central problem that resulted in the children's removal from the family home in the 30 May 2018 adjudication order. In that order, the trial court detailed the incidents of domestic violence that had occurred in the family home during March and July 2017, resulted in the intervention of law enforcement officers, and caused the removal of the children from the parent's care before noting that the children had

previously been in DSS custody and that "the issues for [ ] removal [in this instance were] similar to the prior removal reasons." According to the trial court, "[t]here was ongoing constant domestic violence in the home between [the parents,]" "[t]here were numerous 911 calls due to domestic violence[,]" "[respondent-mother] ha[d] made numerous attempts to leave the home with the juveniles[,]" "[respondent-mother] admitted to . . . ongoing issues of domestic violence with [respondent-father,]" and "this is clearly a case where domestic violence between [respondents] has made this environment injurious to their children." In order to remedy the problems resulting from the ongoing domestic violence between the parents and in an effort to achieve reunification, the trial court had ordered respondent-father to "[p]articipate in a domestic violence assessment at Family Services or with the COOL Program and follow all recommendation[s]."

In its termination order, the trial court found that:

> 26. [Respondent-father] attended 4 domestic violence classes: an intake session on April 7, 2018, and classes on May 5, 2018, May 12, 2018, May 17, 2018, and May 26, 2018. He was discharged unsuccessfully on August 15, 2018.

> 27. [Respondent-father] has failed to demonstrate the concepts taught in domestic violence classes. The [guardian ad litem] for the children learned of an incident at the [respondent-father's] home involving a disturbance for which law enforcement was called in November 2018.

> . . . .

> 34. . . . [Respondent-father] has failed to fully engage in domestic violence treatment.

Although respondent-father does not contend that Finding of Fact Nos. 26 and 27 lack sufficient evidentiary support, he does assert that these findings fail to support the trial court's determination that he had failed to make reasonable progress in addressing his domestic violence problems in light of the surrounding circumstances.

A careful review of the record evidence satisfies us that Finding of Fact Nos. 26, 27, and 34 are supported by clear, cogent and convincing evidence. At the termination hearing, the social worker testified that respondent-father had not complied with the trial court's order to complete domestic violence classes. In spite of the fact that respondent-father enrolled in domestic violence classes provided by the COOL Program on 7 April 2018 and attended four classes on 5, 12, 17, and 26 May 2018, there was no evidence that he had had any further involvement in or had completed that or any other domestic violence program as of the date of a review hearing held on 5 December 2018. In addition, the social worker testified that the staff of the COOL Program had indicated that respondent-father had not attended any classes since 26 May 2018 and that respondent-father had not demonstrated the ability to utilize the concepts that he had been taught in the domestic violence classes that he had attended. Furthermore, the guardian ad litem testified that he had received a report that there had been 911 calls relating to disturbances at respondent-father's home approximately every other month during 2018. Although the report

did not provide any details relating to these calls, the guardian ad litem asserted that the number of calls made during 2018 was similar to the number of calls relating to respondent-father's residence shown in an earlier report and "ma[d]e the point that the house, or the home ha[d] the same pattern of behavior [as] the last time [he] ran the 911 report[.]" In our opinion, this evidence provides ample support for Finding of Fact Nos. 26, 27, and 34 and demonstrates that respondent-father failed to fully engage in domestic violence treatment.

In seeking to persuade us to reach a different result with respect to this issue, respondent-father argues that the record evidence shows that he was attentive and engaged during the four domestic violence classes that he did attend. According to respondent-father, his limited attendance constituted reasonable progress under the circumstances, with it not being "surpris[ing] that [he] stopped attending [the domestic violence classes]" given that the trial court had ended the stipend for his expenses that was being drawn from the children's accounts, reduced his visitation with the children, and eliminated reunification as the permanent plan. In addition, respondent-father points to the social worker's testimony that, prior to the termination hearing, respondent-father "thought the rights had already been terminated with prior court proceedings." Finally, respondent-father contends that, "[i]n the context of the case, even though [he] did not complete the COOL [P]rogram, he was reasonably addressing the issues relating to domestic violence." We do not find these arguments persuasive.

In light of the lengthy history of domestic violence between the parents dating back to the initial DSS involvement with the family in 2011, the trial court did not err by determining that respondent-father's limited attendance at and his failure to complete the COOL Program constituted a failure to fully engage in domestic violence treatment and a lack of reasonable progress toward addressing the issue of domestic violence. Although the 11 July 2018 order did end respondent-father's ability to obtain access to a $25 monthly stipend from the children's accounts, reduce respondent-father's visitation with the children, and eliminate reunification as the permanent plan for the children, that order did not terminate respondent-father's parental rights in the children. On the contrary, the 11 July 2018 order contained provisions requiring respondent-father to address the concerns that had resulted in the children's removal from the family home, including a requirement that he complete domestic violence classes. In addition, the 11 July 2018 order authorized monthly visits with the children, which respondent-father continued to attend through November 2018. Simply put, respondent-father's mistaken belief that his parental rights in the children had been terminated was unreasonable and does not either justify his failure to address the issue of domestic violence or render the minimal progress that he did make toward addressing the issue of domestic violence reasonable. *See In re B.O.A.*, 372 N.C. 372, 385, 831 S.E.2d 305, 314 (2019) (explaining that the trial court has the authority to decide whether a parent's limited progress toward compliance with the provisions of his or her case plan was

reasonable). In the event that respondent-father is contending that he was unable to continue participating in domestic violence classes because he could not afford them in the absence of the monthly stipend, any such argument is refuted by the fact that financial assistance was available through the COOL Program and the fact that respondent-father had never "at any given point stopped by the office with . . . concerns about the financial barriers."

Similarly, respondent-father argues that the trial court had erred by finding that he had failed to make reasonable progress toward correcting the conditions that had led to the children's removal from the family home given that, even though he and respondent-mother continued to live together, the record contained no evidence that there had been ongoing conflict between them. Although the record does not contain any definitive indication that there had been recent instances of domestic violence between the two parents, it did contain evidence tending to show that law enforcement officers had been summoned to address disturbances at respondent-father's home at a level that was similar to the rate at which such calls had been made during earlier stages of this proceeding. Moreover, given the long history of domestic violence between the parents, which resulted in determinations that the children were neglected juveniles in both 2011 and 2018, the absence of evidence that there had been any recent incidents of domestic violence between the parents does not suffice to establish that respondent-father had adequately addressed the issue of domestic violence given his failure to make reasonable efforts to complete required

domestic violence education.[6]  As a result, we conclude that the record does not support respondent-father's assertion that there was no longer any reason for concern that he would be involved in incidents of domestic violence with respondent-mother.

Aside from his argument that he had made reasonable progress toward addressing the conditions that had led to the children's removal from the family home, respondent-father contends that there has been a substantial change in circumstances because he is no longer required to interact with Adam.  More specifically, respondent-father asserts that "several of the incidents preceding the neglect adjudication arose from conflicts between [himself] and [Adam]" and that a psychologist who had evaluated him had concluded that, while he was capable of parenting his own children, Adam's behaviors exceeded respondent-father's parenting capabilities.  In view of the fact that Adam's permanent plan did not involve a return to respondent-father's home, respondent-father argues that the principal obstacle to his ability to parent the children would no longer be present there.  This aspect of respondent-father's challenge to the trial court's order reflects little more than his failure to comprehend the underlying domestic violence problem confronting the family and rests upon a failure to accept responsibility for the domestic violence that plagued the family home.

---

[6] As an additional matter, the trial court noted that respondent-mother's oldest son, Adam, was involved in a physical altercation with respondent-father on 29 July 2017 that stemmed from Adam's intervention into a physical altercation between the parents for the purpose of protecting respondent-mother.

The trial court's order reflects a clear understanding of the lengthy history of domestic violence in the family home and respondent-father's failure to make reasonable progress toward addressing the principal obstacle toward reunification that had been identified in the trial court's initial adjudication and disposition order. For that reason, we hold that the trial court's findings support its determination that "[t]here is a strong probability of repeated neglect of [Maria], [Brenda,] and [Andrew] should they be returned to the care[,] custody and control of . . . [respondent-father]"[7] and that respondent-father's parental rights in the children were subject to termination on the grounds of neglect pursuant to N.C.G.S. § 7B-1111(a)(1). In addition, given that the existence of a single ground for termination suffices to support the termination of a parent's parental rights in a child, *see In re A.R.A.*, 373 N.C. at 194, 835 S.E.2d at 421, and that respondent-father has not challenged the lawfulness of the trial court's best interests determination, we affirm the trial court's termination order with respect to respondent-father.

## C. Respondent-Mother's Appeal

---

[7] As a result of our determination that the trial court's findings of fact concerning respondent-father's failure to adequately address the issue of domestic violence suffice to support its determination that his parental rights in the children were subject to termination on the basis of neglect, we need not address respondent-father's challenge to the trial court's findings relating to the issues of substance abuse, the suitability of respondent-father's home, and the nature and extent of respondent-father's contacts with DSS. *See In re T.N.H.*, 372 N.C. at 407, 831 S.E.2d at 58–59 (stating that "we review only those findings necessary to support the trial court's determination that grounds existed to terminate respondent's parental rights").

Next, we will address respondent-mother's contention that the trial court erred by finding that the termination of her parental rights would be in the best interests of the children. The trial court's best interests determination is governed by N.C.G.S. § 7B-1110, which provides that:

> [t]he court may consider any evidence, including hearsay evidence as defined in [N.C.G.S. §] 8C-1, Rule 801, that the court finds to be relevant, reliable, and necessary to determine the best interests of the juvenile. In each case, the court shall consider the following criteria and make written findings regarding the following that are relevant:
>
> (1) The age of the juvenile.
>
> (2) The likelihood of adoption of the juvenile.
>
> (3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
> (4) The bond between the juvenile and the parent.
>
> (5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
> (6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019). "The trial court's assessment of a juvenile's best interests at the dispositional stage is reviewed solely for abuse of discretion." *In re A.U.D.*, 373 N.C. at 6, 832 S.E.2d at 700; *see also In re Z.A.M.*, 374 N.C. at 99–100, 839 S.E.2d. at 800 (reaffirming the use of an abuse of discretion standard of review for the purpose of reviewing a trial court's best interests determination pursuant to

N.C.G.S. § 7B-1110(a)). An "[a]buse of discretion results where the court's ruling is manifestly unsupported by reason or is so arbitrary that it could not have been the result of a reasoned decision." *In re A.U.D.*, 373 N.C. at 6–7, 832 S.E.2d at 700–01 (quoting *In re T.L.H.*, 368 N.C. 101, 107, 772 S.E.2d 451, 455 (2015)). "The trial court's dispositional findings of fact are reviewed under a 'competent evidence' standard." *In re K.N.K*, 374 N.C. 50, 57, 839 S.E.2d 735, 740 (2020) (citation omitted).

In its termination order, the trial court made detailed findings of fact that addressed each of the relevant statutory criteria. More specifically, the trial court found that Andrew was thirteen years old, that Brenda was twelve years old, and that Maria was nine years old at the time of the termination hearing and that each of the children had spent approximately thirty-eight months of their lives in DSS custody. In addition, the trial court found that, while no prospective adoptive families had been identified for the children, an adoption recruiter had become involved, so that the likelihood that each child would be adopted was very high. Furthermore, the trial court found that termination of the parents' parental rights in the children was necessary to effectuate the permanent plan of adoption; that the children had strong bonds with their parents and with the caregivers in the group home in which they had been placed; that the children were doing well in school and therapy and had no special needs; that the adoption recruiter was working to locate a family who would be willing to adopt all three children; that the children understood that the situation with their parents was not getting better; and that the children were not

resistant to the plan of adoption. Finally, the trial court found that the adoption recruiter believed that there were no barriers to the children's adoption and that the guardian ad litem recommended that the parents' parental rights in the children be terminated given that the children had been in foster care for a lengthy period of time and needed a safe, permanent home.

Although respondent-mother acknowledges that "[t]he trial court made findings concerning the enumerated factors of N.C. Gen. Stat. § 7B-1110(a)," she questions the sufficiency of the evidentiary support for certain of the trial court's findings and faults the trial court for failing to make findings concerning the extent to which the children would consent to being adopted. As an initial matter, respondent-mother disputes the validity of the trial court's determination in Finding of Fact Nos. 37, 43, and 49 that the likelihood that the children would be adopted was "very high." According to respondent-mother, the fact that the children "were placed in a group home with no identified adoptive placements[;]" that "[t]he adoption recruiter testified that it could be up to two years before an adoptive family is found[;]" that the children had strong bonds with respondents and wanted to be returned to their care; and that, since Brenda and Andrew were more than twelve years old, they must consent to be adopted fatally undermined the trial court's findings relating to the adoptability issue.

The trial court's finding that there was a high likelihood that the children would be adopted has adequate record support. A social worker with responsibility

for handling this matter testified that she believed that all three children had "a great likelihood of adoption[.]" In addition, the social worker's testimony tended to show that the children had adjusted well to their current placement, that they had formed bonded relationships with their caregivers and other children who lived in the group home in which the children resided, that the children had no special needs and were not on medication, and that the children were generally doing well in school and succeeding in therapy. In addition to describing the circumstances in which the children currently found themselves, the guardian ad litem testified that he had no concerns about the children's ability to bond with an adoptive family and that termination of the parents' parental rights in the children would be in the children's best interests given their need for safety and permanence. In light of this testimony, we have no hesitation in concluding that the trial court's findings with respect to the issue of adoptability have ample record support.

In addition, we conclude that respondent-mother's argument that the likelihood that the children would be adopted was not high and her assertion that the trial court's statement in Finding of Fact No. 56 that there were "no barriers to adoption" was devoid of sufficient evidentiary support lack persuasive force. Although respondent-mother is correct in stating that no adoptive placement had been identified for the children, the absence of such a placement does not preclude the termination of a parent's parental rights in his or her children. *See In re A.R.A.*, 373 N.C. at 200, 835 S.E.2d at 424 (finding no error in the trial court's best interests

determination despite the absence of an identified adoptive placement for the juvenile) (citing *In re D.H.*, 232 N.C. App. 217, 223, 753 S.E.2d 732, 736 (2014)). The adoption recruiter assigned to work with the children testified that she first met with the children on 3 December 2018, that she was in the initial phase of attempting to find an adoptive placement for them, and that the second stage in that process, which included participation in adoption-related events, would begin in several months. In spite of the fact that the adoption recruiter did state that the longest that it had taken to complete an adoption in the cases in which she had been involved was "probably 18 months, two years[,]" her testimony to that effect did not constitute an estimate of the amount of time that it would take to find an adoptive placement for the children in this case. Instead, the adoption recruiter testified that "[e]ach situation really is different," with the trial court having clarified that the adoption recruiter's testimony was "based on the kids that she has worked with in the past." Simply put, the record does not support respondent-mother's assertion that the adoption recruiter testified that "it could be up to two years before an adoptive family is found" for the children.

Moreover, contrary to the assumption upon which this particular aspect of respondent-mother's argument rests, the possibility that the adoption process would be a lengthy one does not preclude a finding that there is a high likelihood that the children will be adopted. On the contrary, the adoption recruiter testified that there were no barriers to the children's adoption and that the termination of the parents' parental rights in the children would be in their best interests by making them

eligible for listing with adoption services agencies and making additional avenues for identifying an adoptive family available to them. As a result, the testimony provided by the adoption recruiter supports the trial court's findings that there were no barriers to the children's adoption and that there was a high likelihood that the children would be adopted.

In addition, respondent-mother argues that the likelihood that the children would be adopted was not high given that the children had strong bonds with the parents, that the children wanted to return to their parents' care, and that Brenda and Andrew would be required to consent to any adoption because they were over twelve years old, *see* N.C.G.S. § 48-3-601(1) (2019), with this aspect of respondent-mother's argument being directed against Finding of Fact Nos. 47, 53, and 55. A careful review of the record evidence, however, satisfies us that the relevant findings of fact have sufficient support given that the record contains evidence tending to show that, while the children hoped that they could return to their parents' care and while they would like for this outcome to come to pass, the intensity of their hopes that such an outcome would ever happen had diminished given the passage of time and missed parental visits. In addition, the record contains evidence tending to show that the children were aware that the adoption recruiter was looking for an adoptive family and that Andrew and Brenda had expressed preferences concerning the composition of any adoptive family that might become available, a fact that suggests that these two children had begun to accept the idea that they would be adopted. Although the

guardian ad litem testified that Maria did not want to be adopted and simply wished to return to the parents' care, the record also contains evidence tending to show that even she understood that the problems that the parents had been experiencing had not been resolved. According to the adoption recruiter, even though the children wanted to return to the family home, they acknowledged that conditions there had not improved. As a result, we hold that the trial court's findings that the children understood that the parents had not addressed the issues that had resulted in their removal from the family home and that Andrew and Brenda did not resist the idea of adoption had adequate evidentiary support.[8]

In spite of the fact that the existence of a close bond between the children and the parents, the children's preference for returning to the parental home, and the necessity for certain of the children to consent to an adoption are clearly relevant to a trial court's best interests determination, we are not satisfied that these facts preclude a finding that the children are likely to be adopted. Instead of ignoring these issues, the trial court addressed them in Finding of Fact Nos. 39, 45, and 51 and considered them in the course of making its ultimate best interests determination. Similarly, while the trial court is entitled to consider the children's wishes in

---

[8] The guardian ad litem's testimony at the termination hearing does not support the trial court's finding that Maria was not resistant to adoption. However, a finding that Maria opposed being adopted did not preclude a determination that termination of the parents' parental rights in the children would not be in their best interests, rendering the trial court's error in this respect harmless in light of the other surrounding facts and circumstances.

determining whether termination of their parents' parental rights would be appropriate, their preferences are not controlling given that the children's best interests constitute "the 'polar star' of the North Carolina Juvenile Code." *In re T.H.T.*, 362 N.C. 446, 450, 665 S.E.2d 54, 57 (2008); *see also Clark v. Clark*, 294 N.C. 554, 577, 243 S.E.2d 129, 142 (1978) (stating that "[t]he expressed wish of a child . . . is . . . never controlling upon the court, since the court must yield in all cases to what it considers to be for the child's best interests, regardless of the child's personal preference"). As a result, given that the trial court's findings of fact have adequate evidentiary support and given that the trial court considered all of the relevant factors before determining that termination of the parents' parental rights would be in the children's best interests, the trial court did not commit any prejudicial error of law in the course of making its best interests determination.

Furthermore, respondent-mother argues that the trial court erred by failing to make findings of fact concerning the extent to which Brenda and Andrew would consent to be adopted. To be sure, N.C.G.S. § 48-3-601 provides that a juvenile over the age of twelve must consent to an adoption. N.C.G.S. § 48-3-601(1) (2019). On the other hand, N.C.G.S. §48-3-601 governs adoption, rather than termination of parental rights, proceedings. In addition, N.C.G.S. § 48-3-603(b) provides that a trial judge may dispense with the requirement that a child who is twelve years of age or older consent to an adoption "upon a finding that it is not in the best interest of the minor to require the consent." *Id.* § 48-3-603(b)(2). For that reason, any refusal on

the part of Brenda and Andrew to consent to a proposed adoption would not preclude their adoption in the event that the trial judge made the necessary findings. As a result, given that a refusal on the part of one or more of the children to consent would not necessarily preclude their adoption, we hold that the trial court was not required to make findings and conclusions concerning the extent, if any, to which Brenda and Andrew were likely to consent to any adoption that might eventually be proposed.

Similarly, respondent-mother argues that the trial court erred in making Finding of Fact Nos. 40, 46, and 52, in which it found that the children had strong relationships and had bonded with the persons responsible for their care in the group home in which they lived. Instead of arguing that these findings lack sufficient evidentiary support, respondent-mother contends that the challenged findings are irrelevant because N.C.G.S. § 7B-1110(a)(5) requires consideration of the "quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement," N.C.G.S. § 7B-1110(a)(5) (2019), rather than the quality of the relationship between the children and the persons caring for them in their current non-adoptive placement. To be sure, the trial court could not make a finding concerning the quality of the children's relationship with any prospective adoptive parent because no such persons had been identified. On the other hand, the trial court's findings concerning the ability of the children to bond with their current caregivers did tend to support a conclusion that the children were adoptable given their ability to develop a bond with other human beings. Thus, the

trial court did not err by making findings of fact concerning the bond between the children and their current caretakers.

Finally, respondent-mother challenges Finding of Fact No. 57, in which the trial court found that "[p]overty is not the cause for [respondents'] neglect of their children." In response, respondent-mother argues that "poverty was most certainly an issue that impacted [her] ability to reunify with the juveniles." Although respondent-mother is correct in noting that her parental rights are not subject to termination in the event that her inability to care for her children rested solely upon poverty-related considerations, *see* N.C.G.S. § 7B-1111(a)(2) (2019) (providing that "[n]o parental rights . . . shall be terminated for the sole reason that the parents are unable to care for the juvenile on account of their poverty"), the challenged trial court finding appears to relate to the trial court's decision that grounds for the termination of respondent-mother's parental rights existed, a determination that respondent-mother has not challenged on appeal, rather than to the trial court's best interests determination. However, to the extent that the trial court intended for Finding of Fact No. 57 to relate to the dispositional, as well as the adjudicatory, stage of the present proceeding, we conclude that Finding of Fact No. 57 is supported by the unchallenged findings that respondent-mother failed to comply with substance abuse treatment; failed to demonstrate sustained sobriety; failed to obtain domestic violence counseling and demonstrate the ability to use the concepts that she had learned during that process; continued to reside with respondent-father; and failed to

consistently keep FCDSS aware of changes in her employment, residence, and contact information and conclude that the trial court's decision that it would be in the children's best interests for respondent-mother's parental rights to be terminated did not rest solely upon respondent-mother's poverty.

Thus, with a single exception, we conclude that the trial court's findings of fact had ample evidentiary support. Moreover, in spite of the existence of record evidence tending to show that the children were strongly bonded to the parents and wanted to return to their care, the termination order establishes that the trial court performed a reasoned best-interests analysis and did not abuse its discretion by determining that the termination of respondent-mother's parental rights in the children would be in their best interests. For that reason, given that respondent-mother has not challenged the trial court's determination that grounds for the termination of her parental rights in the children existed, we hold that the trial court did not err by terminating respondent-mother's parental rights in the children. As a result, the trial court's termination order is affirmed with respect to both parents.

AFFIRMED.